FILED
2015 Aug-06  PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **GERALD BELL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Civil Action No.: 4:14-CV-523-RDP** |
| } | |
| **CAROLYN W. COLVIN,** } | |
| **Acting Commissioner of the Social** } | |
| **Security Administration,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OF DECISION

Plaintiff Gerald Bell brings this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB") under Title II, and Supplemental Security Income ("SSI") under Title XVI. 42 U.S.C. §§ 405(g) and 1383(c). Based on the court's review of the record and the parties' briefs, the court finds that the decision of the Commissioner is due to be affirmed.

## I.    Proceedings Below

Plaintiff filed his applications on May 17, 2011. (Tr. 273). He alleged a disability onset date of January 1, 2000.[1] (Tr. 228, 230). Plaintiff's applications were initially denied by the Social Security Administration ("SSA"). (Tr. 154, 155). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 173). The request was granted and a hearing was held on August 3, 2012 via video teleconference in Anniston, Alabama before ALJ Bruce W. MacKenzie. (Tr. 82–124). At the hearing, Plaintiff, Plaintiff's half-sister Ms. Glenda Bell, and

---

[1] Plaintiff's disability onset date was amended to May 17, 2011, the date of the applications. (Tr. 86).

vocational expert Marcia H. Schulman ("VE") each testified. *Id.* In his decision, dated September 24, 2012, the ALJ determined Plaintiff had not been disabled within the meaning of Sections 216(i), 223(d), and 1614(a)(3)(A) of the Act since January 1, 2000. (Tr. 59–76). On January 23, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, which became the Commissioner's final decision, and thus a proper subject of this court's appellate review. (Tr. 1–4).

## II.    Facts

Plaintiff was forty-six years old at the time of the hearing, is divorced, and has two adult daughters and a five-year-old son. (Tr. 67, 91). Plaintiff reports a family history of mental illness, including schizophrenia and depression. (Tr. 22, 382, 493, 641). Plaintiff graduated from high school, where he was in Special Education and EMR (educable mentally retarded) courses.[2] (Tr. 338). Plaintiff went on to community college for two years on a baseball scholarship.[3] *Id.* Plaintiff testified his kneecap was shattered by a baseball, and that he had continued difficulty walking, kneeling, and bearing weight on the knee. (Tr. 71, 98).

Plaintiff's past employment was as janitor and dishwasher, and he performed other menial work. (Tr. 304). He was last employed in 1994. (Tr. 96, 244, 246). Plaintiff had previously received disability benefits, but they were discontinued upon a drug-possession incarceration. (Pl.'s Mem. 7; Tr. 17, 531–32). Plaintiff alleges that he has experienced the following mental impairments: severe depression with suicidal ideation, status post suicide

---

[2] The acronym "EMR," is defined by the Office of the Assistant Secretary for Planning and Evaluation. *See* Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, Common Acronyms, *available at* http://aspe.hhs.gov/daltcp/acronym.shtml (last visited Jun. 26, 2015). The ALJ's findings cast some doubt on Plaintiff's report that he was in special education in high school, as do various professionals in the record. (Tr. 73, 367, 261). Even Plaintiff once denied he was in special education. (Tr. 382–84). Nevertheless, Plaintiff's high school transcript contain the notations "special education" and "EMR". (Tr. 338).

[3] The record is unclear on whether Plaintiff earned an associate's degree. (Tr. 66, 277, 483, 485, 486, 494).

attempts; mixed personality disorder with avoidant traits; paranoid schizophrenia with auditory and visual hallucinations; generalized anxiety disorder with panic attacks and psychotic features; mood disorder; and mental retardation.  His alleged physical impairments are as follows: lower back pain status post lower back strain; severe left joint knee pain due to large joint effusion; hypertension; and left leg pain.  (Tr. 221, 339).

Plaintiff's medical history notably involves depression and schizophrenia.  (Tr. 263, 485). Plaintiff was hospitalized at Northeast Alabama Regional Medical Center ("NEARMC") in November 1997 for suicidal ideation (he stated his intent to slit his wrists).  (Tr. 363).  Chris Randolph, M.D. diagnosed major depression, recurrent, on Axis I,[4] and noted possible manic disorder, organic hallucinosis, and substance abuse to be ruled out.[5]  (Tr. 364).  Plaintiff reported hallucinations but did not seem to be actively hallucinating during the examination.  *Id.*  The DSM diagnoses were: Axis II—mixed personality disorder with avoidant traits; Axis III— no acute processes; and Axis IV—unemployment and relationship-breakup stressors.  (Tr. 364–65). Dr. Randolph put Plaintiff's GAF at 35 "in light of recent hallucinosis and threats of harm to self" but noted "there are very vague psychiatric complaints." (Tr. 365).  Plaintiff's discharge GAF was 55.  (Tr. 361).

A September 15, 1999 psychiatric review technique ("PRT") form completed by Dr. Kenneth Warren was almost entirely blank, but was marked "insufficient medical evidence" for alleged schizophrenia and mental retardation, and "[p]ossible [b]orderline IQ." (Tr. 368).  As to

---

[4] For the "multiaxial" framework, *see* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 25–34 (4th ed. 1994), *available at* http://www.terapiacognitiva.eu/dwl/dsm5/DSM-IV.pdf.  Axis I is the main diagnosis, Axis II renders a diagnosis as to personality disorders or intellectual disabilities, Axis III considers potentially relevant medical or neurological conditions, Axis IV evaluates patient's main stressors, and Axis V looks at the Global Assessment of Functioning or "GAF" 0–100 score, 100 being the highest level of functioning.

[5] On discharge, Dr. Randolph modified Axis I to "Major depression, recurrent[;] Alcohol abuse."  (Tr. 361).

Plaintiff's medical history, Dr. Warren noted "[n]o ongoing treatment for mental disorder" and contrasted an "[a]llegation of special education" with Plaintiff's two years of community college. (Tr. 369).  Dr. Warren noted a February 1995 consultative examination ("CE") leading to a diagnosis of schizophrenia "and possible [p]re-morbid [b]orderline IQ" but stated "[Plaintiff's] schizophrenia scores [were] never called valid."  *Id.*  Plaintiff's WAIS-R IQ scores were around 60.  *Id.*  Dr. Warren also noted that Plaintiff was hospitalized in November 1997 due to depression.  *Id.*  Dr. Warren summarized by stating, "Information conflicting and insufficient." *Id.*  On the same date in 1999, State Department of Disability Services ("DDS") examiner Dennis Pugh noted the February 1995 CE and that in March 1995, DDS found "Plaintiff met Listing 12.05C . . . [diagnosis]: mental retardation[,] schizophrenia" but "[t]ests [sic] score not stated as valid was schizophrenia."  (Tr. 367).  Mr. Pugh concluded "insufficient information" and "conflicts in file," noting that Plaintiff failed to report for a CE and had no ongoing treatment.  (*Id.*).

The next year, in May 2000, and at DDS's request, clinical psychologist Dr. Yolanda Suárez conducted a comprehensive psychological examination of Plaintiff.  (Tr. 382–84).  Her diagnoses were Axis I—major depression recurrent with psychotic features; Axis II—avoidant traits; Axis IV— "divorce, estrangement from family, unemployment, poverty" stressors; and Axis V—a GAF of 50.  (Tr. 384).  Dr. Suárez noted that Plaintiff reported "hallucinations and nervousness around people" and, while not suicidal on examination, Plaintiff "exhibited symptoms of recurrent depression that sometimes involved mood-congruent psychotic features." *Id.*  Plaintiff reported visual hallucinations of rats, smoke, or bugs, and auditory hallucinations of harsh words from the Devil.  (Tr. 383).  Dr. Suárez saw Plaintiff as "often vague," noting inconsistencies between his statements to her and the record.  (Tr. 384, 383).  For example, Dr.

Suárez noted inconsistencies with respect to Plaintiff's past alcohol use, smoking, and legal problems. (*Id.*).

Later that month, a PRT by Dr. Gloria Roque (a psychologist) found Plaintiff met several subparts of Listing 12.03 for schizophrenic, paranoid, and other psychotic disorders. (Tr. 253–61). Dr. Roque noted delusions or hallucinations, emotional withdrawal and/or isolation, and "[s]chizophrenia paranoid type vs. major depression w[ith] psychotic features." (Tr. 254). She marked "unclear" for Listing 12.05 (mental retardation) and "insufficient evidence" for Listing 12.09 (substance addiction disorders). Dr. Roque noted Plaintiff "[c]laims no [alcohol] use in some time . . . though the '95 CE noted . . . 6 beers [a] day[.]" (Tr. 256, 258). She assessed "paragraph B" impairments as "marked" for restriction of activities of daily living ("ADL's") and problems in social functioning; "frequent" for deficits in concentration, persistence, or pace; and "insufficient evidence" as to episodes of decompensation. (Tr. 259). Dr. Roque found Plaintiff's "predomina[nt] problems[of] hallucination and delusions" made it hard to assess his intellectual function. (Tr. 261). Dr. Roque observed a seeming conflict between low IQ scores in 1995 and educational history, but added "the school noted he was in EMR classes in [high school]." Dr. Roque concluded Plaintiff met Listing 12.03A and B based on category 12.03 (schizophrenic, paranoid, and other psychotic disorders). (Tr. 253).

Plaintiff was treated for back pain in 2003 based on an acute lumbar strain, and received further treatment for back pain from 2007 through 2010, with a diagnosis of acute sciatica in 2009.[6] (Tr. 392–95, 477–80, 474, 429–30, 452, 431–36, 443–49, 453, 455, 457, 441–42). He experienced acute dental pain with advanced decay beginning in 2004, leading to multiple tooth extractions while he was in prison in 2010. (Tr. 394–403, 552, 555, 632). In February 2010,

---

[6] Helping his mother move and carrying a refrigerator up stairs were two causes of back injury in the record. (Tr. 392–93, 497–48). In April 2010, the injury came from playing softball. (Tr. 447).

Plaintiff was hospitalized for second-degree scald burns over 12-15% of his body, which he suffered while trying to put out a grease fire. (Tr. 462–64). On May 31, 2010, Plaintiff was treated for traumatic knee pain after stepping in a hole and suffering a twisting injury. (Tr. 409–23, 456, 458).

While in prison, Plaintiff received mental health and other medical care. (Tr. 528–637). At his mental health intake screening, he answered affirmatively for first incarceration, family support, and feeling "significant depression/remorse." (Tr. 537). Plaintiff reported no current suicidal thoughts or hallucinations, no history of treatment, suicidal attempts or thoughts, substance abuse, special education, or any other aspect of mental health history. (*Id.*). A September 2010 treatment plan notes "Depression Evidence[d] by Low Interest, Low Energy, [and] . . . Irritabil[ity]." (Tr. 551). But a November 2010 psychiatric progress note from Alabama Department of Corrections states that Plaintiff had reported that his "depression ha[d] subsided significantly." (Tr. 585). Upon his release from prison, Plaintiff's diagnosis reflected improvement: "[d]epression NOS [p]artial [r]emission." (Tr. 600).

On May 25, 2011, just after Plaintiff's release from prison, therapist Bonne Evans, LGSW at Calhoun-Cleburne Mental Health Center ("CCMHC") performed a clinical intake, and noted that he had a "[history] of depression" and that he stated he was "trying to stay out of the depression mood." (Tr. 485). Plaintiff reported severe anxiety, paranoia, and social withdrawal, and hallucinating shadows and spiders. (Tr. 482). Ms. Evans saw no clinical evidence of alcohol or drug abuse, and recommended outpatient psychiatric care every four to six weeks, or as needed, for one year. (Tr. 485). After a July 2011 therapy session, Ms. Evans saw Plaintiff "making progress." (Tr. 490). A week later, disability interviewer B. Waldrep noted Plaintiff's behavior and appearance as "good" with "[n]o limitations noted." (Tr. 274).

On September 8, 2011, licensed psychologist Robert G. Summerlin, Ph.D. examined Plaintiff upon a request for consultation by the state DDS. (Tr. 493–95). Dr. Summerlin's diagnoses were as follows: Axis I—paranoid schizophrenia, mood disorder not otherwise specified ("NOS"), and learning disorder NOS; Axis II—no diagnosis; Axis III—reference to medical records; Axis IV—stressors of unemployment and "[c]hronic [m]ental [h]ealth [i]ssues"; and Axis V—GAF of "50 [minus]", with "[s]erious [c]ognitive-[e]motional [s]ymptoms [a]ffecting [p]ersonal, [s]ocial, and [o]ccupational [f]unctioning." (Tr. 495). On mental status exam Plaintiff was oriented to person, place, and circumstance—but not time. (*Id.*). Dr. Summerlin found higher-than-expected abstract thinking, "low-average" general information, reckoning, and vocabulary, and "somewhat limited" remote memory. (*Id.*). "[T]hought processes were logical, coherent, and focused" and Plaintiff was "responsive to questioning with evidence of paranoid mentation and possible . . . hallucinations." (*Id.*). Plaintiff reported "see[ing] shadows," hearing negative voices, and feeling "everyone is watching him" in crowds. (*Id.*). Dr. Summerlin states Plaintiff can "bathe, dress, and groom himself without assistance" but often lacks motivation to do so and "is not involved in household chores . . . ." (Tr. 495).

On September 29, 2011, psychiatrist Maurice Jeter, M.D. diagnosed Plaintiff with: major depressive disorder, recurrent mild; and with anxiety disorder NOS on Axis I; deferred his diagnosis on Axis II; made no diagnosis on Axis III; and noted "[c]hronic mental illness" and "[l]egal troubles" stressors as to Axis IV; and made a GAF finding of 60 as to Axis V. (Tr. 516). Plaintiff reported experiencing "isolative and panic attacks, especially around crowds[,]" leading to nervousness and social withdrawal. (Tr. 515). Although Plaintiff reported "a predominance of depressive symptoms[,]" Dr. Jeter found "no evidence of overt anxiety" to the degree Plaintiff reported. (*Id.*). Plaintiff also reported a history of psychotic symptoms but Dr. Jeter found "no

present psychosis." (*Id.*). Dr. Jeter perceived Plaintiff "appear[ed] to possibly be under reporting his role" with regard to drugs, though "he has admitted to abusing drugs fifteen years ago." (Tr. 516). Dr. Jeter observed Plaintiff with good eye contact, normal speech, no abnormal movement, euthymic mood, congruent affect, "[n]o suicidal/homicidal ideations, no psychosis[,] [a]lert and oriented x 4[,]" with good insight and judgment. (*Id.*).

On October 11, 2011, psychiatrist Samuel D. Williams, M.D., the state DDS consultant, completed a PRT form diagnosing Plaintiff with organic mental disorders, schizophrenia, paranoid and other psychotic disorders, and affective disorders. For the relevant Listings (12.02, 12.03, and 12.04), Dr. Williams determined a residual functional capacity ("RFC") assessment was needed. (Tr. 497). Dr. Williams also found the following medically determinable impairments not precisely satisfying the respective diagnostic criteria: learning disability; schizophrenia, paranoid type; and mood disorder, NOS. (Tr. 498–500). Dr. Williams's "paragraph B" ratings were "moderate" for restriction of ADL's, social-functioning limitations, and trouble with concentration, persistence, and pace; the finding for extended episodes of decompensation was "none." (Tr. 507). Dr. Williams concluded the "paragraph C" criteria were not met. (Tr. 508). In a detailed mental RFC assessment, Dr. Williams found Plaintiff "not significantly limited" with respect to seven abilities (among them recalling locations and work-like procedures, following simple instructions, and asking simple questions). (Tr. 511–12). Dr. Williams found Plaintiff "moderately limited" with respect to ten abilities, including extended concentration, schedules and attendance, and following routines without special supervision. *Id.* Dr. Williams found Plaintiff "markedly limited" with respect to detailed instructions and public interaction. *Id.* Dr. Williams's four overall RFC findings were Plaintiff: (1) could "carry out simple . . . , but not detailed, tasks[,]" can find locations, and follow simple directions; (2) could

give "attention to a simple task for two hours" but not extended periods and needed "a flexible daily schedule and all customary rest periods in roomy work places with familiar coworkers"; (3) required limited public contact, and "non-confronting" criticism; and (4) needed "infrequent and gradual[]" workplace changes.  (Tr. 513).

Progress notes from therapist Bonne Evans indicated an improvement in Plaintiff's mental health over the first half of 2012.  (Tr. 517–522).  In February 2012, Plaintiff reported that he "no longer dwell[t] on the negatives," could "see the light at the end of the tunnel," and had been attending church since January.  (Tr. 518).  In May 2012, Ms. Evans found Plaintiff was in good spirits, free of panic attacks for months, gardening, and "help[ing] folks he met at church."  (Tr. 519–20).  A treatment plan drawn up in June by Ms. Evans and Dr. Jeter identified Plaintiff's issues as psychiatric, emotional/psychological, thinking, family/social support, and self-direction/learning. (Tr. 523). Plaintiff indicated he hoped for recovery, including good family ties and helping neighbors and churchgoers; he also "thank[ed] God that I'm living and . . . have someone that cares about me."  The plan also noted the support Plaintiff received from his mother and sister.  (*Id.*)

Plaintiff was evaluated on July 26, 2012 by licensed psychologist David R. Wilson, Ph.D., at Plaintiff's attorney's request.  (Tr. 640–44).  Dr. Wilson diagnosed Plaintiff with major depressive disorder, recurrent, with psychotic features; mild mental retardation on Axis II; did not make any diagnosis with respect to Axis III; found stressors of "[s]evere social isolation and occupational limitations" along with "[i]nadequate [a]ccess to [n]ecessary [m]edical or [p]sychiatric care" under Axis IV; and determined a GAF of 45 on Axis V.  (Tr. 644).  Dr. Wilson found Plaintiff suffered from a "thought disorder, with recurrent hallucinations," was "chronically depressed," and "tends to isolate because he cannot deal with people."  *Id.*  Dr.

Wilson observed Plaintiff as "forlorn, depressed[,] and distressed." (Tr. 642). Plaintiff reported hearing voices "most of the time," including the Devil "telling [him] that [he is] not worthy." (Tr. 642–43). Plaintiff also reported constant suicidal ideation, "hanging myself or cutting on myself"; however, Dr. Wilson noted that past self-cutting was now controlled with medication. (Tr. 643). Dr. Wilson stated "[Plaintiff] . . . appear[s] to have some paranoid delusions," "rock[ing] all the time," and panic attacks. (*Id.*). He also found that Plaintiff's insight and judgment were "poor"; he had "serious problems" with mental control, attention, and concentration"; he was "highly deficient" in general knowledge and reasoning abilities; he suffered from "impaired short term memory"; and had verbal skills in the mildly retarded range. (Tr. 643–44). Dr. Wilson concluded Plaintiff "would have severe difficulty in any type of job," "difficulty with the social and the task and problem solving aspects" of any job, and "not likely to improve significantly in the next 12 months." (Tr. 644). Dr. Wilson's Mental Source Health Statement of the same date found "moderate" limitation in three abilities relating to simple instructions, asking questions, and requesting help; "marked" limitation in four abilities including making simple work-related decisions, accepting instructions and responding to criticism; and "extreme" limitation in thirteen abilities, among them recalling locations and work procedures, detailed instructions, extended concentration, and attendance. (Tr. 638–39).

The record reflects that Plaintiff received psychiatric evaluation and therapy from Bonne Evans,[7] LGSW, in May and June 2011 and from February through June 2012. (Tr. 482–86, 490, 517–27). Dr. Jeter conducted a psychiatric evaluation September 29, 2011, an office visit August 2, 2012, and participated jointly with Ms. Evans in drawing up treatment plans in June 2012 and March 2013. (Tr. 515–16, 9–10, 523–27, 13–17). In September 2011, Dr. Jeter

---

[7] Ms. Evans served as Plaintiff's therapist subsequent to his release from prison, in conjunction with psychiatric care by Dr. Jeter.

diagnosed Plaintiff with major depressive disorder recurrent mild, and with anxiety disorder NOS.  (Tr. 515–16).  Dr. Jeter's Axis IV diagnosis lists Plaintiff's psychosocial stressors as "chronic mental illness" and "legal troubles."  (Tr. 516).

Plaintiff gave the Appeals Council records of his treatment received subsequent to the denial of benefits.  (Tr. 8–22, 25–50, 127–53).  Plaintiff reported multiple suicide attempts.  (Tr. 128–52, 33–50).  The record also confirms a lithium overdose in February 2013 which led to Plaintiff's hospitalization at Jacksonville Medical Center and a later transfer to NEARMC.  (*Id.*).  Andrejs Trenins, M.D. examined Plaintiff at NEARMC, noting "past medical history significant for schizophrenia and history of hypertension."  (Tr. 38).  Four months after his discharge from NEARMC, Donna Cordes, CRNP diagnosed Plaintiff with schizophrenia, chronic paranoid type; major depressive disorder, chronic, moderate; and history of cocaine and marijuana abuse; an Axis II diagnosis of personality disorder NOS; financial, housing, and transportation stressors for Axis IV; and an Axis V finding of GAF of 61.[8]  (Tr. 22).  Ms. Cordes noted Plaintiff's report of daily auditory hallucinations of several voices and "seeing shadows."  (Tr. 8, 22).  Ms. Cordes was "uncert[a]in if this patient is forthcoming about his intentions," a remark that appears to concern Plaintiff's possible drug use.  (Tr. 22).

## III.  The ALJ's Decision

Disability under the Act is determined in five steps.  20 C.F.R. § 404.1520.  In the first step, the ALJ must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is

---

[8] There were no findings with respect to Axis III.  (Tr. 22).

11

done for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).

In the second step, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such a finding of impairment, the claimant may not claim disability.  *Id.*  If the alleged impairment is mental, the second step of the analysis also involves the application of what are referred to as the "paragraph B criteria."  20 C.F.R. 404 Subpt. P. App. 1, § 12.00.  The four criteria used to determine whether a mental impairment is severe are: (1) activities of daily living ("ADL's"); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).  For an impairment to be found severe, there must be "marked" limitation in at least two of the criteria enumerated above, although only one "marked" limitation may be sufficient if it seriously interferes with the claimant's ability to function effectively on a sustained basis.  20 C.F.R. 404, Subpt. P, App. 1, § 12.00C.  If, under the "paragraph B" criteria enumerated above, there is a determination of severe mental impairment, the analysis moves to step three, where the same criteria will be used to determine whether the claimant meets a Listing.  If a claimant does not meet the "paragraph B" criteria, the analysis moves to "paragraph C."  20 C.F.R. §§ 404.1520(c), 416.920(c).  The "paragraph C criteria" require a medically documented history of a mental impairment of at least two years duration that has caused more than a minimal limitation of ability to carry out basic work activities, together with repeated, extended episodes of decompensation, or likelihood of decompensation under even minimal environmental stressors, or inability to function without a highly supportive living arrangement or one's own home.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the "paragraph C" criteria are not

met, claimant cannot claim disability based on that mental impairment. If the "paragraph C" criteria are met, however, the analysis moves to the third step.

In the third step of the analysis, the ALJ must determine whether a claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. However, the ALJ must first determine the claimant's RFC, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. § 404.1520(e).

In the fourth step, the ALJ determines whether a claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant is determined capable of performing past relevant work, the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, the analysis proceeds to the fifth step. 20 C.F.R. § 404.1520(a)(4)(v).

In the fifth step of the analysis, the ALJ must determine whether a claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence in significant numbers of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, the ALJ initially determined Plaintiff satisfied the insured status requirements of the Act through September 30, 2012. (Tr. 61, 241). Then, after determining that Plaintiff is not gainfully employed, thus satisfying the first step of the analysis, the ALJ determined Plaintiff has

two severe impairment: major depressive disorder and hypertension.  20 C.F.R. §§ 404.1520(c), 416.920(c).  (Tr. 61).  The ALJ next considered "paragraph B" criteria and determined that, because Plaintiff's mental impairment does not cause at least two "marked" limitations, or, alternatively, one "marked" limitation along with "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not met.  (Tr. 62–63).  The ALJ noted Plaintiff's ability to conduct activities of daily living, such as dressing and bathing, with moderate difficulty.   (Tr. 62).   The ALJ also noted Plaintiff's reestablishing ties with his daughters, improved sleep, and enjoying a new dog.  (Tr. 63).  Having found the "paragraph B" criteria not met, the ALJ then considered the "paragraph C" criteria.  Absent repeated episodes of decompensation, or any indication that an increase in mental demands or environmental changes would trigger decompensation, the ALJ determined the "paragraph C" criteria also were not met and thus Plaintiff's impairments did not meet or medically equal the criteria of Listings 12.03, 12.04, 12.06, or 12.08.  (Tr. 62–63).

The ALJ then proceeded to the third step.  There, the ALJ found Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1.  (Tr. 62–64).  The ALJ determined Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), but with the following limitations: (1) no unprotected heights or using motor vehicles; (2) only occasional work near dangerous mechanical parts; (3) moderate noise; (4) routine, repetitive task, unable to perform at production rate pace, but could perform goal-oriented work; (5) only occasional interaction with coworkers, supervisors, and the public; (6) a routine work setting with few changes; (7) infrequent, constructive, non-confrontational criticism; (8) work in a small group setting; and (9) gradual work place changes.  (Tr. 64).

14

In the fourth step, the ALJ determined Plaintiff has no past relevant work. This made it necessary for the ALJ to review the fifth and final step of the analysis. (Tr. 75). It is at the fifth step where the burden shifts to the Commissioner to demonstrate the existence of available employment consistent with Plaintiff's impairments. The ALJ relied on the vocational expert's ("VE") testimony at the August 2012 hearing to reach the finding that, in spite of Plaintiff's limitations, he was capable of performing various occupations. (Tr. 75–76). The appropriate occupations discussed by the VE fell within the "unskilled, sedentary" category and included sorter/grader, machine tender, and packer/sealer. (*Id.*). Based upon the VE's testimony of the existence of employment to which Plaintiff would be able to adjust successfully, the ALJ determined that Plaintiff was not disabled under the Social Security Act from January 1, 2000 (the originally alleged disability onset date) through September 24, 2012, when the ALJ rendered his decision. (Tr. 228, 230, 76).

## IV.   Plaintiff's Argument for Reversal

Plaintiff's argument section contains extensive summaries of medical records, block quotations from the transcript, and in some instances lengthy excerpts from case law. For the sake of organization and clarity, rather than consider the arguments in the order in which Plaintiff's Memorandum raises them, the court has grouped Plaintiff's arguments into categories by the type of issue raised as follows: (a) Plaintiff's argument that the prior award of Social Security disability benefits to him makes him eligible for benefits now; (b) Plaintiff's attacks on whether the ALJ's findings are supported by substantial evidence; (c) Plaintiff's assertions that the ALJ failed to apply the correct legal standards; and (d) Plaintiff's contention that the Appeals Council improperly failed to remand for review of newly submitted evidence.

## V.      Standard of Review

In reviewing the Commissioner's decision, this court is limited to two questions.   First, does the record reveal substantial evidence to sustain the ALJ's decision?  42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982).  Second, did the ALJ apply the correct legal standards in reaching his decision?  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In sum, "[w]hen . . . the ALJ denies benefits and the Appeals Council denies review, [the court] review[s] the ALJ's 'factual findings with deference' and his 'legal conclusions with close scrutiny.'  *Riggs v. Soc. Sec. Admin., Comm'r*, 522 F. App'x 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; rather, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See Id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Substantial evidence is more than a scintilla but may be less than a preponderance; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  The court must affirm the Commissioner's factual findings if substantial evidence supports those findings, even if it believes the evidence preponderates against them.  *See Martin*, 894 F.2d at 1529.

As to the legal standards underlying the Commissioner's decision, the court submits those standards to review *de novo*.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Even a determination supported by substantial evidence may be in error if "coupled with or derived from faulty legal principles." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). While acknowledging that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## VI.   Discussion

For the reasons stated below, the court concludes that the ALJ's decision is due to be affirmed.

### A.   Because This Case Involves a New Application for Benefits, Not a Challenge to Cessation of Benefits, the ALJ Properly Made His Determination Without Regard to Prior Decisions Regarding Benefits.

Plaintiff argues that the fact that he was previously awarded Social Security benefits entitles him to a favorable outcome here. In particular, he contends that his benefits may be terminated only "upon a showing that there has been medical improvement related to the ability to work." (Pl.'s Mem. 17 (citing *Williams v. Apfel*, 73 F. Supp. 2d 1325, 1337 (M.D. Fla. 1999), and in turn citing 42 U.S.C. § 423(f); 42 U.S.C. § 1382c(a)(4); and *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982))). Plaintiff's argument is off the mark.

Plaintiff previously received SSI benefits for depression and schizophrenia; however, his benefits were terminated due to his incarceration.[9] (Tr. 17). The period of incarceration was July 22, 2010 to May 14, 2011. (Tr. 302). The cessation of benefits was due to his incarceration, and such a cessation is mandated by federal statute. 42 U.S.C. § 402(x)(1)(A)(i).

---

[9] The record suggests there was also an earlier termination of benefits, prior to the one caused by his incarceration. The ALJ noted that Plaintiff received SSI for seven years and lost the benefit after failing to appear for an appointment. (Tr. 66–67). However, the record is unclear exactly when this earlier termination occurred. Because Plaintiff's appeal refers only to the cessation at the time of Plaintiff's incarceration on July 22, 2010, the court considers only that particular cessation and the issue of whether Plaintiff is entitled, under 20 C.F.R. § 404.1594(a), to restoration of the previously conferred benefits.

On May 17, 2011, after his release from incarceration, Plaintiff made a new application for DIB and SSI benefits.  (Tr. 228, 230).

In making this argument, Plaintiff relies in particular on the *Simpson* court's citation to the Fifth Circuit, which stated that "[o]nce evidence has been presented which supports a finding that a given condition exists, it is presumed in absence of proof to the contrary that the condition has remained unchanged."  *Simpson*, 691 F.2d at 969 (quoting *Rivas v. Weinberger*, 475 F.2d 255, 258 (5th Cir. 1973)).  Under 20 C.F.R. § 404.1594, the SSA is statutorily required to review periodically the continued entitlement of a claimant to disability benefits; "[i]f medical improvement related to your ability to work has not occurred and no exception applies, your benefits will continue."  42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a).   However, this standard applies when the reason for a claimant's appeal is a cessation of benefits, which was the situation in both *Williams* and *Simpson*.   The presumption of continuing disability in *Williams* and *Simpson* does not apply to new applications for benefits following a cessation.  *Tomaszewski v. Colvin*, No. 5:13-cv-374-MTT, 2015 WL 893523, at *3 (M.D. Ga. Mar. 2, 2015) ("Because Plaintiff now challenges his 'new' or 'second' application in the instant case, as opposed to challenging the Commissioner's termination of his previous award of benefits, *Simpson* is not precisely on point."); *see also Richardson v. Bowen*, 807 F.2d 444, 446 (5th Cir. 1987); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990) ("Claimant may not use . . . later applications for benefits as an attempt to circumvent the appeal requirements for a termination of benefits. The medical improvement standard applies only in termination cases, not in later applications for benefits.").  Because Plaintiff's application for benefits was a new one, the ALJ properly made his determination pursuant to federal statute 42 U.S.C. § 402(x)(1)(A)(i), based on the case record as a whole and without particular regard to prior decisions regarding benefits.  20 C.F.R.

§§ 404.1520(a)(3), 404.1520b, 404.1527, 416.920(a)(3), 416.920b, 416.927.   The ALJ did not

err in doing so.

> **B.      Whether the ALJ's Decision Was Supported by Substantial Evidence.**

Plaintiff makes two separate arguments challenging the evidentiary support with respect

to the key findings made by the ALJ.  Plaintiff's first argument relates to his alleged mental

impairments, while the second more broadly addresses the appropriate consideration of the

totality of the evidence he submitted.   The court addresses each in turn.

> **1.      Substantial evidence supports the ALJ's finding that Plaintiff does not
> meet Listings 12.03, 12.04, 12.06, and 12.08.**

Plaintiff alleges that substantial evidence does not support the ALJ's finding that he does

not meet Listings 12.03 (schizophrenic, paranoid, and other psychotic disorders), 12.04 (affective

disorders), 12.06 (anxiety related disorders), and 12.08 (personality disorders) (Pl.'s Mem. 20–

34).  Candidly, his argument is somewhat difficult to follow.  It contains fifteen pages which are

almost entirely made up of lengthy citations from the record.   The argument is also confusing

because it (at least partially) reiterates Plaintiff's separate assertion that he has shown no

improvement in his impairments since a prior award of benefits (Pl.'s Mem. 20), an argument

this court has already addressed above.   Plaintiff makes the broad-brush assertion that "[t]he

Record is clear that Claimant has not improved" since the earlier award.   (*Id.*).  For support,

Plaintiff relies upon a page in the ALJ's decision that presents evidence for the ALJ's finding

that Plaintiff does not meet the specified Listings.  (Tr. 62).  On the cited page, the ALJ refers to

the October 11, 2011 evaluation by Dr. Williams[10] in which Dr. Williams found (1) only

moderate restrictions of ADL's—social functioning; maintaining concentration, persistence, and

---

[10] On this particular page of his decision, the ALJ does not refer to Dr. Williams by name, but the date and
results of the evaluation make clear that he is referring to Dr. Williams's evaluation.

pace; and (2) no episodes of decompensation.  (*Id.*).  Plaintiff references Dr. Williams's findings

but notes Dr. Williams's opinion "that [Plaintiff's] mental impairments did not *precisely* satisfy

the diagnostic criteria of a listed impairment."  (*Id.*).  The emphasis supplied by Plaintiff implies

that the evaluation found that Plaintiff *broadly* satisfied the diagnostic criteria.  (Pl.'s Mem. 26).

However, Plaintiff has not cited to Dr. Williams's opinion itself, but only to the ALJ's summary

of that opinion.[11]  (Pl.'s Mem. 26; Tr. 68).[12]  The court has considered Plaintiff's argument as

best can be discerned from his Memorandum.  The legal standard in assessing an ALJ's factual

findings is whether the findings are supported by "substantial evidence," even if not by a

preponderance.  42 U.S.C. §§ 405(g) and 1383(c); *Martin*, 894 F.2d at 1529.  With one limited

exception addressed below (which involves evaluation of the "new" evidence Plaintiff submitted

to the Appeals Council), it is not this court's role to reevaluate or reweigh the evidence.  Nor

should this court substitute its judgment for that of the Commissioner.  *Martin*, 894 F.2d at 1529

(citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  The ALJ relied upon Dr.

Williams's finding of moderate restrictions, observations by therapist Bonne Evans showing

Plaintiff's improved mood and functioning, and Plaintiff's credibility in light of his inconsistent

statements and demeanor at the hearing.  (Tr. 72–75).  While the record contains evidence

contrary to the ALJ's findings, this court finds that the ALJ's decision is clearly supported by

substantial evidence.

---

[11] Further underscoring Plaintiff's failure to account for Dr. Williams's evaluation -- at least for the purpose of making this particular argument -- is the fact that he even reproduces the ALJ's mistaken transcription of "Dr. Samuel Williams" into "Dr. William Samuels." (Pl.'s Mem. 26; Tr. 68).

[12] In failing to make an argument clearly applying the law to particular facts in the record, Plaintiff can be held to have waived his argument.  *Outlaw v. Barnhart*, 197 F. App'x, 835, 828 n.3 (11th Cir. 2006).

2.      **The ALJ's decision was supported by substantial evidence, even in view of the evidence submitted to the Appeals Council.**

Plaintiff essentially makes another "substantial evidence" argument when he contends that the ALJ failed to consider all of the evidence – in particular, the evidence submitted to the Appeals Council.  (Pl.'s Mem. 39–42).  Again, Plaintiff quotes at length from the record (and restates parts of his other arguments), but fails to make a clear argument applying the law to particular facts in the record.[13]  Plaintiff's contention that, when the new evidence is considered, the ALJ's decision is not based on substantial evidence is without merit.

Plaintiff alleges the ALJ "ignored the diagnosis of schizophrenia" and cites to one page of the ALJ's decision.  (Pl.'s Mem. 39; Tr. 68).  To the contrary, the ALJ took note of Plaintiff's diagnoses—both of schizophrenia and of depression with psychotic features.  (Tr. 69, 62, 67, 70).  Plaintiff states "[i]n order to deny benefits the ALJ had to find [Plaintiff] not reliable (R-72), give partial weight to Dr. Wilson (R-74), and failed to assess the weight given to Dr. Samuels (R-68) and . . . Dr. Summerlin. (R-68)[.]"  (*Id.*).  But none of the allegations address the "substantial evidence" issue before the court.

Plaintiff also challenges the evidentiary value of the Vocational Expert's testimony about Plaintiff's ability to work "because the hypothetical question . . . did not accurately state claimant's mental limitations or his residual functional capacity."  (Pl.'s Mem. 41).  Although Plaintiff quotes the ALJ's hypothetical question verbatim, he fails to point to any inaccuracies. (*Id.*).  Plaintiff also objects that "the hypothetical question assumed claimant could work[.]" (*Id.*).

---

[13] As already noted *infra*, under these circumstances Plaintiff can be deemed to have waived this argument. *Outlaw*, 197 F. App'x at 828 n.3.

In his hypothetical question posed to the Vocational Expert, the ALJ described a certain set of characteristics — including limitations to "routine and repetitive tasks," inability "to perform at production rate pace," and "work only in small group settings." (Tr. 113–14). The ALJ then asked the Vocational Expert whether such an individual could work under those conditions, and if so whether a substantial number of jobs matching those characteristics exists in the national economy. (Tr. 114–15). Plaintiff has not presented any argument that in any way suggests the ALJ's hypothetical question was mistaken or unsupported, or that the ALJ misapplied the Vocational Expert's answer.

This court concludes that while the record certainly contains evidence which is contrary to the ALJ's factual findings, his findings are nevertheless supported by substantial evidence.[14]

---

[14] The court has taken account of the "new" evidence Plaintiff submitted to the Appeals Council. (Indeed, it is addressed more fully below). One item of new evidence that relates to the period before the period before the ALJ's decision is Dr. Jeter's August 2012 treatment note from Plaintiff's Calhoun-Cleburne Mental Health Center exam. (Tr. 9). Importantly, Dr. Jeter's August 2012 findings *support* the decision of the ALJ. Dr. Jeter found Plaintiff was "stable overall," his cognition was "appropriate to the situation," and his current regimen was effective. (*Id*.). As discussed above, the record reveals that the ALJ appropriately assigned "great weight" to Dr. Jeter's earlier opinions as Plaintiff's treating physician and as a specialist giving opinions in his area of specialty. (Tr. 74), citing 20 C.F.R. § 404.1527(d)(5). Thus, this additional evidence from Dr. Jeter only bolsters the ALJ's decision and undermines Plaintiff's argument that remand is warranted based on the whole of the record. *See Shaw v. Astrue*, 392 F. App'x 684, 687 n.1 (11th Cir. 2010); *East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006).

Plaintiff's records from Jacksonville Medical Center and Northeast Alabama Regional Medical Center relate to Plaintiff's February 2013 attempted suicide, which occurred over four months after the ALJ's decision. Notably, the discharge summary indicated that Plaintiff was free of suicidal thoughts and stable upon discharge. (Tr. 35 ("Given that patient was free of suicidal thought he was sent home with follow up in the outpatient clinic.")). Moreover, a July 2013 therapy session at Calhoun-Cleburne Mental Health Center reflects that Plaintiff was making progress in all of his stated goals. (Tr. 20). At that time, Plaintiff reported to his therapist that his outbursts were limited (*i.e.*, only two in two months) and that he was making new friends. (*Id*.).

Certainly, not all of the new evidence reinforces the ALJ's decision. But the ALJ's decision need only be supported by "substantial evidence" in light of the whole record. Again, it has been said that "substantial evidence" is a forgiving standard. Substantial evidence is more than a scintilla but may be less than a preponderance; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). Ultimately, the conflicting evidence offered by Plaintiff on appeal regarding his post-relevant-period suicide attempt does not deprive the record as a whole of substantial evidence supporting the ALJ's denial of benefits. Accordingly, the court concludes that remand is not appropriate because the new evidence does not render the denial of benefits erroneous. *See Ingram*, 496 F.3d at 1262.

### C.      Whether the ALJ Applied Proper Legal Standards.

Plaintiff next alleges the ALJ improperly: (1) rejected the opinion of a consultative psychologist, and substituted his own opinion instead; (2) discounted the opinion of a consultative psychologist because that opinion was secured by Plaintiff's attorney; (3) employed "sit and squirm jurisprudence"; (4) failed to consider Plaintiff's impairments, both serious and non-serious, in combination; and (5) failed to consider all of Plaintiff's serious impairments.  The court addresses each of these arguments below.

### 1.      The ALJ did not reject the opinion of a consultative psychologist, nor substitute his own opinion for that of the psychologist.

Plaintiff's assertions that the ALJ improperly rejected the opinion of consultative psychologist Dr. Summerlin and that he also improperly substituted his own opinion are simply non-meritorious.[15] (Pl.'s Mem. 34–35, Tr. 493–95).  Of course, an ALJ cannot substitute his own judgments for those of medical and vocational experts.  *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982).  And a hearing officer "may not arbitrarily substitute his own hunch or intuition for the diagnoses of a medical professional."  *Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir. 1992) (Johnson, J., concurring).

Dr. Summerlin's opinion was but one piece of the medical evidence presented to the ALJ. That opinion was based upon a September 2011 evaluation of Plaintiff, which was performed for the Commissioner.  Although Plaintiff contends the ALJ improperly rejected the opinion of Dr. Summerlin and substituted his opinion without any explanation, he has not pointed to any part of the ALJ's decision to support that allegation. By making such a naked assertion, unsupported by

---

[15] In making this objection, Plaintiff relies on *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995) and quotes from three Northern District of Alabama cases that cite to *Wilder*.  The *Wilder* court found the ALJ erred in rejecting the expert opinion of an ALJ-appointed psychiatrist: "We are led to consider with a degree of suspicion the [ALJ's] decision to go against the only medical evidence in the case. . . ."  *Wilder*, 64 F.3d at 337–38.  But, unlike the situation here, in *Wilder* the psychiatrist's opinion constituted the sole medical evidence.  As explained below, the ALJ in this case also considered the opinions of Drs. Jeter and Williams.

reference to the record, Plaintiff has been deemed to have waived this argument. *Outlaw*, 197 F. App'x at 828 n.3. But even putting the waiver issue aside, the ALJ's decision reveals no rejection of Dr. Summerlin's opinion. (Tr. 67–68). Here, there are multiple medical evaluations of Plaintiff. The ALJ assigned "great weight" to Dr. Jeter's opinions as Plaintiff's treating physician and as a specialist giving opinions in his area of specialty, and to Bonne Evans as Plaintiff's therapist. (Tr. 74). The ALJ also relied greatly on Dr. Williams's psychiatric review technique form and detailed assessments of Plaintiff's abilities and limitations. (Tr. 68–69). This court finds the ALJ did not err in his treatment of Dr. Summerlin's evaluation.

> ### 2. The ALJ did not err in discounting the opinions of a consultative psychologist, giving them only "partial weight" because they were secured through referral by Plaintiff's attorney.

Plaintiff next contends that the ALJ improperly discounted the opinions of Dr. David R. Wilson, a licensed psychologist. (Pl.'s Mem. 35–39; Tr. 638–44). In assessing Dr. Wilson's opinion, the ALJ stated as follows:

> As for opinion evidence, I afford partial weight to Dr. Wilson's opinion at Exhibits 21F and 22F. It is emphasized that [Plaintiff] underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, the doctor was presumably paid for the report. Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored.

(Tr. 74). In *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996), the Eleventh Circuit reviewed an ALJ's determination of Social Security benefits in which the ALJ made certain credibility determinations with respect to a physician's assessment of the claimant. As part of that credibility determination, the ALJ in *Miles* noted that the physician's examinations of the claimant referred to him by a certain attorney "almost invariably conclude[d] that the person being examined is totally disabled." *Id.* at 1399. After reviewing the record, the Eleventh Circuit found that there was no evidentiary support for that conclusion, and that "[t]he ALJ's

observations . . . with respect to the medical opinions rendered by [the physician for the attorney's] clients reflect that the process was compromised in [that] case." *Id.* at 1401. But *Miles* is of no help to Plaintiff here.

The aspersions cast by the ALJ in the *Miles* case are a far cry from what occurred in this case. Here, the ALJ made clear that the evidence proffered by Dr. Wilson, and his opinion, was "certainly legitimate and deserve[] due consideration." (Tr. 74). To be sure, the ALJ also said that Dr. Wilson's opinion was based upon an "attorney referral and in connection with an effort to generate evidence for the current appeal," (*id.*), and that the context in which Dr. Wilson's opinion was produced cannot be entirely ignored. (*Id.*). Read in context, the court concludes that these somewhat inartful statements were simply a part of the ALJ's assessment of credibility. Indeed, in this case, there were conflicting opinions about Plaintiff's medical status. A careful review of the record indicates that there are a number of differences between Dr. Wilson's assessments and those of Plaintiff's treating physician. The Commissioner's brief summarizes a number of points on which Dr. Wilson's opinions (and the information Plaintiff provided Dr. Wilson) differ from the opinions of other medical professionals (and the information Plaintiff provided those persons). (*See* Commr's Brief at 25-27 (detailing how Plaintiff's accounts given to Dr. Wilson of his education, legal history, and substance abuse varied significantly)).[16]

---

[16] Plaintiff also provided conflicting information about his educational history and other matters at the hearing before the ALJ. Plaintiff reported to Dr. Wilson that he was in special education in high school and that, because he was an athlete, he never had to work hard in high school or college. (Tr. 73, 642). To other medical professionals, however, Plaintiff frequently denied any special education, reported being a "good student," and even indicated that he earned an associates' degree. (Tr. 73, 483, 485). When questioned about his legal history, the only incident Plaintiff reported to Dr. Wilson was a past charge for possession of cocaine (Tr. 74, 642), while other evaluators noted that Plaintiff was also arrested or cited for robbery, assault, writing bad checks, traffic tickets, and possession of marijuana. (Tr. 74, 383, 494). Plaintiff also obscured his history of substance abuse in conversations with Dr. Wilson, indicating that he neither smoked nor used illegal drugs since 1995 — even though Plaintiff's medical reports plainly suggest otherwise. (Tr. 74, 361-64, 383, 443, 462, 540, 565, 642).

In light of the record evidence and the parties' arguments, the critical question the court must answer is this: Does substantial evidence support the ALJ's findings? Here, the answer is yes. There is substantial evidence supporting the ALJ's conclusions that Dr. Wilson's opinion differs substantially from the opinions of others, and is in conflict with the medical testimony and medical evidence found elsewhere in the record. The ALJ's inartful language does not change that conclusion.

### 3.  The ALJ did not indulge in improper "sit and squirm jurisprudence."

Plaintiff next argues the ALJ used "sit and squirm jurisprudence." This term refers to an instance in which an ALJ, who is not a medical expert, subjectively generates a list of traits he believes a claimant alleging certain impairments must manifest during the hearing, and denies the claim when he does not observe those traits. *E.g.*, *Freeman v. Schweiker*, 681 F.1 727, 731 (11th Cir. 1982); *accord Yates v. Astrue*, Case No. 2:06-CV-563-FTM-29-DNF, 2008 WL 1882653 at *6, n.6 & 7 (M.D. Fla. Apr. 24, 2008).   In *Chambers v. Astrue*, 671 F. Supp. 2d 1253 (N.D. Ala. 2009), the court faulted an ALJ for engaging in just this type of subjective jurisprudence:

> Simply because the ALJ did not notice the plaintiff to be in discomfort, or unable to perform tasks with his hands or arms during a hearing that lasted less than one hour and did not require the plaintiff to perform any work oriented tasks, does not allow the ALJ to ignore the medical evidence and opinions of the plaintiff's treating physicians regarding the plaintiff's use of his hands or legs.

*Id.* at 1261.  Plaintiff's argument that the ALJ subjectively judged the case on some index of traits cuts no ice at all.

Plaintiff appears to contend that the ALJ erred by stating that "[a]nother factor influencing the conclusions . . . is [Plaintiff's] generally unpersuasive appearance and demeanor while testifying at the hearing. It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding . . . credibility . . . ." (Tr. 73).  But the

Eleventh Circuit has held that an ALJ "is not prohibited 'from considering the claimant's appearance and demeanor during the hearing.'" *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987) (quoting *Norris v. Heckler*, 760 F.2d 1154, 1157–58 (11th Cir. 1985)).  In fact, the Social Security Rulings state an "adjudicator may . . . consider his or her own recorded observations of the individual" at an administrative hearing as part of the overall evaluation of the credibility of the individual's statements," along with the medical, work, and other evidence in the case record. SSR 96-7p, 1996 WL 374186, at *5.

The ALJ based his skeptical assessment of Plaintiff's credibility, at least in part, on his observation of Plaintiff's appearance and demeanor during the hearing, as well as inconsistencies in various statements by Plaintiff.  (Tr. 73–74).  At no time did the ALJ put forth a list of traits which he subjectively expected Plaintiff to manifest during the hearing or face denial of his appeal.  Therefore, this court finds no basis for challenging the ALJ's use of his direct observation of Plaintiff, much less for crediting Plaintiff's allegation that the ALJ employed "sit and squirm jurisprudence."

### 4.     The ALJ did not fail to consider Plaintiff's combination of impairments, regardless of their degree of severity.

Plaintiff alleges the ALJ failed to consider his impairments in combination.  (Pl.'s Mem. 44–46).  Plaintiff cites to the Social Security Regulations, which state in relevant part:  "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.   The Eleventh Circuit has stressed that impairments must be considered in combination.  *Walker v. Bowen*, 826 F.2 996, 1001 (11th Cir. 1986), ("[w]hen 'a claimant has

alleged a multitude of impairments, a claim for social security benefits may lie even though none of the impairments, considered individually, is disabling.'") (quoting *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).

Further, the *Walker* court held it "the duty of the . . . [ALJ] to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Walker*, 826 F.2d at 1001 (quoting *Bowen*, 748 F.2d at 635; 20 C.F.R. § 416.923). An ALJ's failure to consider each alleged impairment and to assess the impairments' combined effect led the Eleventh Circuit to remand in *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986). The *Gibson* court stated: "Clearly, the ALJ must consider every impairment alleged" and "address the degree of impairment caused by the '*combination* of physical and mental medical problems.'" *Gibson*, 779 F.2d at 623 (quoting *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)). However, as noted in *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529 (11th Cir. 1991), the ALJ's reference to the "combination of impairments" suffices to show "consideration of the combined effect of appellant's impairments." *Id.*, at 1533 (citing *Wheeler v. Heckler*, 784 F.2d 1073 (11th Cir. 1986)).[17] Here, the ALJ determined that: "[Plaintiff's] impairments, singularly and in combination, ha[ve] been compared to all listed impairments." (Tr. 62). The ALJ also found "the severity of [Plaintiff]'s impairments, even in combination, does not equal the level of severity contemplated in the listings." *Id.* The ALJ's decision refers to Plaintiff's combination of impairments. Therefore, this court finds no error by the ALJ on this issue.

---

[17] *See also Coleman ex rel. J.K.C. v. Commissioner of Social* Security, 454 F. App'x 751 (11th Cir. Dec. 9, 2011) (per curiam), where the court held an ALJ's reference to a "combination of impairments" shows the ALJ considered their cumulative effect. *Id.* at 761.

> **D.      In Denying Review, the Appeals Council Did Not Properly Articulate Its Evaluation of New Evidence Submitted by Plaintiff, Failing to Consider Its Possible Chronological Relevance.**

Plaintiff also argues the Appeals Council improperly declined to remand under sentence four, and did not properly articulate its evaluation of the new evidence submitted by Plaintiff. (Pl.'s Mem. 46–54).  The new evidence which Plaintiff submitted to the Appeals Council consisted of treatment records of Calhoun-Cleburne Mental Health Center (from August 2012 to July 2013) (Tr. 8-22), Northeast Alabama Regional Medical Center (From February 2013) (Tr. 25-30, 34-50), and Jacksonville Medical Center (from February 2013) (Tr. 128-53).  Thus, virtually all of the records submitted were created after the ALJ ruled in this matter.[18]  Plaintiff asserts these records were both new and material and that the Appeals Council erred by not adequately evaluating the evidence.

Here, the Appeals Council stated the medical records provided by Plaintiff from 2013 was "information . . . about a later time.  Therefore, it does not affect the decision about whether [he was] disabled beginning on or before September 24, 2012." (Tr. 2).  The records Plaintiff furnished to the Appeals Council (with one exception already noted) relate to treatment rendered to Plaintiff after the ALJ's decision.  Plaintiff contends that the dispositive questions are whether the new evidence "relates to the period" before the ALJ's decision and whether there is a "reasonable possibility" the new evidence could change the outcome.[19]  *Flowers*, 441 F. App'x at 745.

---

[18] There is one exception—Dr. Jeter's August 2012 treatment note obviously relates to a period before the ALJ's decision.  (Tr. 9).  But, importantly, Dr. Jeter's August 2012 findings <u>support</u> the decision of the ALJ.  Thus, no remand is warranted because of that record.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Shaw v. Astrue*, 392 F. App'x 684, 687 n.1 (11th Cir. 2010); *East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006).

[19] On the first point, the Eleventh Circuit has held the fact that new evidence pertains to treatment provided after an ALJ's decision "does not necessarily make it chronologically irrelevant." *Watkins v. Astrue*, 925 F. Supp. 2d 1257, 1263 (N.D. Ala. 2013).  In *Watkins*, where the plaintiff had chronic back issues, the court held the symptoms'

The additional medical records Plaintiff submitted to the Appeals Council involved depression, suicidality, and other chronic or recurring mental-health diagnoses that could reasonably be seen as relating to the period before the ALJ's decision.   The new evidence contains treatment records by Plaintiff's treating psychiatrist, Dr. Jeter, on whose earlier opinions the ALJ had placed "great weight."   (Tr. 74).   In similar circumstances, where new evidence included records from a physician whose prior reports had been "heavily relied" upon by an ALJ, the Eleventh Circuit held a district court erred in failing to remand for review of the new evidence.  *Lipscomb v. Comm'r of Soc. Sec.*, 188 F. App'x 903, 907 (11th Cir. 2006).   And, in particular, he argues that the Appeals Council committed reversible error by failing to properly articulate an evaluation of the new evidence that Plaintiff submitted to the Appeals Council.   The court concludes that because the new evidence Plaintiff submitted does not render the ALJ's denial of benefits erroneous, remand by the Appeals Council was not warranted.

When a claimant properly presents new evidence to the Appeals Council, the reviewing court must consider whether that new evidence renders the denial of benefits erroneous.  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).   New evidence must be reviewed if it is "material" and relates to the period on or before the date of the ALJ's hearing decision.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); 20 C.F.R. § 404.970(b).   New evidence is "material" if there is a reasonable possibility that the evidence would have changed the ALJ's decision.  *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 745 (11th Cir. 2011).   If the Appeals Council denies review, it "must show in its written denial that it has adequately evaluated the new evidence."   *Flowers*, 441 F. App'x at 745,

---

nature and severity meant the "symptoms . . . could bear on his condition during the relevant period . . . ."  *Watkins*, 925 F. Supp. 2d at 1263–64.

quoting *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980). For the reasons outlined below, the court concludes that the Appeals Council's written denial is appropriate.

When confronted with new evidence, the Appeals Council must show in its written denial that it adequately evaluated the evidence at issue. So, if the Appeals Council merely "perfunctorily adheres" to the ALJ's decision, the Commissioner's findings are not supported by substantial evidence and the decision must be remanded for a determination based on the whole record. *Flowers*, 441 F. App'x at 745. On the other hand, as the Eleventh Circuit has explained, "because a reviewing court must evaluate the claimant's evidence anew, the [Appeals Council] is not required to provide a thorough explanation when denying review." *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 903 (11th Cir. 2011) (noting the Appeals Council had considered and incorporated the new evidence into the record and therefore was not required to explain its denial).

This court recently had the opportunity to address the tension between *Flowers*'s stringent "perfunctory adherence" standard and *Burgin*'s less demanding "thorough explanation" standard. *See Wright v. Colvin*, No. 4:13-CV-01425-RDP, 2015 WL 526806, at *7-8 (N.D. Ala. Feb. 9, 2015). There, this court noted:

> In *Flowers*, the Eleventh Circuit held that the Appeals Council erred by not remanding the case to the ALJ in light of significant new evidence the claimant had offered. 441 F. App'x 745. The *Flowers* court noted that the Appeals Council merely acknowledged that the claimant had submitted new evidence, but "made no further mention of it or attempt to evaluate it." *Id.*
>
> But, the *Flowers* court's remand was not based solely on the Appeals Council's failure to explain how it assessed the evidence. Rather, the remand was based upon the reality that the new evidence created a "reasonable possibility" that if the ALJ had considered the evidence, she may have more fully credited the testimony of the claimant and one of his supporting witnesses. *Id.* at 747. Thus, *Flowers* concluded that the plaintiff's new proffered evidence was material (*i.e.*, there was a reasonable possibility that the new evidence could change the ALJ's decision).

*Id.* ("Given the *materiality* of Flowers's new evidence to the ALJ's RFC finding, the Appeals Council's failure to evaluate it, *alone*, requires us to remand this case to the Appeals Council for a disability determination based 'on the total record.")") (quoting *Epps*, 624 F.2d at 1273) (emphasis added).  Importantly, the Eleventh Circuit appeared skeptical that the Appeals Council adequately reviewed the evidence because the ALJ placed an "unusual" amount of reliance on a nontreating physician while completely rejected an examining physician's findings.  *Id.* at 745.

In *Burgin*, the Eleventh Circuit clarified what it means to adequately evaluate new evidence in a written denial. 420 F. App'x at 903. The Eleventh Circuit rejected the claimant's argument that the Appeals Council failed to adequately explain its denial of review and refusal to remand.  *Id.*  In doing so, the court explained that:

> The [Appeals Council] must consider new, material, and chronologically relevant evidence and must review the case if the ALJ's decision is contrary to the weight of the record evidence. When a claimant properly presents new evidence to the [Appeals Council] and it denies review, we essentially consider the claimant's evidence anew to determine whether "that new evidence renders the denial of benefits erroneous." Thus, because a reviewing court must evaluate the claimant's evidence anew, *the [Appeals Council] is not required to provide a thorough explanation when denying review*.

*Id.* (emphasis added) (internal citations omitted). The key is this: The *Burgin* court, like the *Flowers* court, found materiality to be of the utmost import. *See id.* (noting remand was not required because new evidence's probative value was "slight and did not render denial of benefits erroneous").

*Wright*, 2015 WL 526806, at *7-8; *see also Timmons v. Comm'r v. Comm'r of Soc. Sec.*, 552 F. App'x, 897 (11th Cir. 2013) ("A sentence four remand was warranted *only if* the new evidence considered by the Appeals Council . . . showed that the ALJ's decision to deny benefits was not supported by substantial evidence in the record as a whole." (emphasis added)), citing *Ingram*, 496 F.3d at 1266-67.

Applying these teachings here, this court concludes that the Appeals Council was not required to provide a thorough explanation when denying review of Plaintiff's new evidence.  As

discussed in more detail above, Plaintiff's newly submitted evidence did not show that the ALJ's decision to deny benefits was not supported by substantial evidence in the record as a whole. *See Ingram*, 496 F.3d at 1262. Stated another way, the new evidence was not "material," *i.e.*, there was no reasonable possibility that the evidence would have changed the ALJ's decision. *Flowers*, 441 F. App'x at 745.[20]

## VII.   Conclusion

The ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the ALJ applied the correct legal standards. Accordingly, the decision of the Commissioner is due to be affirmed. A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this August 6, 2015.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[20] Plaintiff's brief focuses, in part, on the argument that the AC should have found the new evidence chronologically relevant. (Tr. 53-54). The court concludes this issue is not dispositive. Therefore, the court assumes for the purpose of this appeal that the new evidence could be deemed chronologically relevant.